**STATE of Missouri, Respondent,**

v.

**David B. TURNER, Appellant.**

**No. 57551.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Nov. 6, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 3, 1991.

Application to Transfer Denied
Feb. 7, 1991.

Joseph M. Hadican, Mary Elizabeth Ott, Clayton, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

CRIST, Judge.

Appeal from a jury conviction for rape, sodomy and armed criminal action for which defendant was sentenced to life imprisonment, a consecutive term of life imprisonment, and a concurrent term of life imprisonment respectively. We affirm.

There is little question but that victim was raped, sodomized and threatened by someone with the aid of a gun. The issue to be determined is who did it. Defendant questions the sufficiency of the evidence to prove it was him. Accordingly, a detailed statement of facts is mandated. In reviewing the sufficiency of the evidence, we accept as true all evidence, whether circumstantial or direct, tending to prove defendant guilty together with all reasonable inferences supporting the verdict. *State v. Steward*, 734 S.W.2d 821, 822 (Mo. banc 1987).

Viewed in the light most favorable to the verdict, the evidence shows: Victim was a friend of defendant's wife. Victim had met defendant two or three times and had spoken to him on the phone several times. In February or March of 1987, defendant's wife introduced victim to Allison Hopson.

Hopson and victim began a dating relationship. In June or July of 1987, they started seeing each other less and victim started going out with another person. Around Thanksgiving of 1987, Hopson told victim that he did not like for her to date others and that he would eventually hurt her if she continued. Hopson said victim was "harsh," "cold," and that victim could not be "tamed."

On December 21, 1987, victim spoke to Hopson on the telephone and they made arrangements to see each other the next day. Hopson told her to come over at about 1:15 p.m. Victim arrived at Hopson's residence at 1:45 p.m. She heard "really loud" music. She saw that Hopson was on the telephone. He spoke on the telephone for about two or three minutes and then he let the victim inside his house. Hopson locked the door. As victim started to go down into the basement, like she normally did, Hopson told her to go upstairs. Victim went into the kitchen and sat down. Hopson showed her some watches.

Victim went into the living room and watched television, while Hopson took a shower. While victim was in the living room, the telephone rang, and Hopson talked to someone on the phone for a couple of minutes. Later, the victim and Hopson went into Hopson's bedroom and began having sexual intercourse.

During the act of sexual intercourse, a black male, between 5 ft. 11 in. and 6 ft. tall, with a dark complexion, a medium average frame, carrying a gun, and wearing a ski mask, appeared in the doorway. The intruder asked Hopson about the location of the valuables. Hopson said they were on the dresser. Hopson's wallet and three of his watches were on the dresser. The intruder said Hopson was holding out and threatened to kill victim if Hopson didn't show him where the valuables were. The intruder and Hopson then left the room and went down into the basement. After about ten minutes, they returned and the intruder told victim he was going to

have sex with her. The intruder raped and sodomized victim.

After the rape, the intruder told Hopson to come with him. They left the room together and went down into the basement a second time. About ten minutes later, Hopson returned and said the intruder was gone. Hopson told victim he had been tied up with shoestrings. Victim noticed that Hopson's wallet and watches were no longer on the dresser.

During the rape, sodomy and pseudo-robbery, victim was wearing three rings and a gold chain. Her purse was at the foot of the bed. It contained over $200 in cash and numerous credit cards. The victim's valuables were not taken by the intruder.

Victim dressed and asked Hopson if he wanted to call the police. Hopson asked victim if she wanted to call the police. She said "yes." Hopson told her that calling the police would not do her any good, because the intruder wore a ski mask. He also told her not to call the police, because it would be embarrassing and humiliating. She had previously told Hopson that she would not do anything to humiliate or embarrass her family. Victim testified at trial she has never told her parents about the rape and sodomy.

Victim went to her home. She told her cousins that she had been raped. One of her cousins called the police. Victim was instructed to go to a hospital. Specimens were taken and victim wrote a three-page statement about the incident.

At about 5 p.m. on the same day, Detective Barnes went to Hopson's residence. Barnes knocked on the door and was met by the owner of the residence. After Barnes identified himself, the owner allowed him to enter the residence. The police officer went downstairs and found the washing machine was operating. Hopson had washed the bottom sheet from the bed on which the rape and sodomy occurred. No bedding was on the bed. Barnes could not find a top sheet for the bed. The owner told Barnes that when she arrived at home at 3:30 p.m. defendant and Hopson were in the kitchen talking.

Barnes used the telephone to speak to Hopson. He asked Hopson to meet him. Within one and one-half hours he met Hopson in his office. After Hopson was informed of his Miranda rights, Hopson said that he had been robbed. Hopson said that his billfold had been taken. Barnes asked if Hopson could have mislaid or lost his billfold. Hopson said, "No, it was at the foot of the bed on the stand when the robbery occurred."

Hopson and defendant were best friends. Hopson told Barnes that defendant arrived at his residence between 4:30 and 5:00 p.m. Hopson provided Barnes with defendant's phone number. Barnes phoned defendant and defendant told Barnes he had been at Hopson's residence prior to 3 p.m. Barnes then asked him to come down to his office. Defendant refused.

At about 8:20 p.m., victim arrived in Barnes' office. Barnes interviewed victim. The description of the intruder which was given by victim matched defendant's description. Barnes also believed defendant was involved in the crime. He noted that a forced entry did not occur. The house was not ransacked. The victim's valuables were not taken. Valuables such as televisions, VCR's, stereo and jewelry in the other rooms of Hopson's residence were not taken. Loud music was playing when the intruder entered the residence. Cars were parked in the driveway when the intruder entered the residence. Hopson tried to talk the victim out of calling the police, and he destroyed evidence by washing a sheet from his bed.

At about 9 p.m., officers went to defendant's residence and placed him under arrest. Defendant put on his trousers and asked his wife to get his billfold. When his wife presented him with a billfold, defendant looked startled and said, "That's not my billfold, that belongs to Allison Hopson." Barnes seized the billfold as evidence. It was identified as being Hopson's billfold.

At about 7 a.m. the next morning, December 23, 1987, Hopson called victim on the telephone. He offered to pay her $2,000 or $3,000 if she would drop the

charges. Victim told Hopson she was not going to drop the charges because they set her up and made her think she was going to die.

Forensic scientist Patricia Dougherty of the St. Louis County Police Department testified that tests were run on a vaginal swab which had been taken from the victim at the hospital. The tests revealed that sperm was present.

Dougherty explained that about 80 percent of the population secrete their blood group antigens into their body fluid. The victim is a type "O" secreter. Defendant is a type "A" secreter. Type "A" and type "H" antigens were found in the vaginal swab. A type "O" secreter cannot secrete type "A" antigens. This evidence was consistent with the State's theory that defendant secreted the antigens which were found on victim's vaginal swab. About 30 to 35 percent of the population are type "A" secreters.

Defendant testified in his own defense. He claimed that he was at home in his kitchen at the time of the crime.

No direct evidence was presented linking defendant with the rape and sodomy of victim. Victim made no identification of defendant as her attacker, but rather identified him as the husband of her friend and the father of the child for whom she sometimes baby-sat. At trial, victim testified she recalled the voice of the intruder was similar to the voice of defendant's.

The evidence was sufficient for reasonable persons to have found defendant guilty. Hopson was angry at victim, because victim was dating other men. Hopson knew in advance victim was coming over to his residence. The jury could have inferred defendant called Hopson, his best friend, after the victim arrived at Hopson's residence.

The jurors could have inferred that a "real robbery" did not occur because very little was taken. Even though Hopson and the intruder left the bedroom together twice, once to look for valuables, there was nothing taken except for Hopson's wallet and watches on the dresser. There was no evidence of a forced entry. It is doubtful that a real thief would have entered a residence in the afternoon which had cars in the driveway and loud music emanating from it.

Defendant told Barnes on the telephone he had been at the Hopson residence before 3 p.m. on the day of the crime. He was also observed at the crime scene shortly after the crime occurred. The owner of the residence said when she arrived at 3:30 p.m. at the residence in which the crimes were committed, defendant and Hopson were in the kitchen talking. Hopson, however, told police that defendant arrived at his residence between 4:30 and 5:00 p.m. The description which victim gave to the police of her assailant matched defendant's description. Victim testified defendant's voice was similar to the intruder's voice.

When defendant was arrested he had Hopson's billfold. This billfold was on Hopson's dresser in his bedroom at the time of the robbery. After the robbery, victim noticed Hopson's billfold was no longer on the dresser. Hopson told Barnes that he had been robbed and his billfold had been taken. Evidence that the billfold was taken during the "robbery" and defendant's possession of it further linked him with the rape and sodomy.

Finally, Hopson's call to victim offering to pay her $2,000 or $3,000 if she would drop the charges was indicative that Hopson and defendant acted in concert. There was sufficient evidence to find defendant was guilty. This point is denied.

Defendant next asserts the State should not have been allowed to lead its own witness, Allison Hopson, without laying a proper foundation. Defendant further asserts it was erroneous to allow the State to call Hopson as a witness since it was the State's theory that Hopson acted together with defendant.

■■■ It is the general rule that the State may not impeach its own witness. *State v. Street,* 732 S.W.2d 196, 199–200[2–4] (Mo.App.1987). A witness may be impeached as hostile, however, by reason of answers which are inconsistent with previous statements, which surprise the party

propounding the questions to such a degree that the witness becomes for all practical purposes a witness for the other side. *Id.*

■ At trial, the prosecutor asked the judge to find Hopson was a hostile witness for the reason that some of Hopson's testimony was a surprise to the prosecutor and was inconsistent with previous statements Hopson had made. The record indicates Hopson was evasive, inconsistent and hostile in his answers to the State on direct examination and friendly to the defense on cross-examination. Hopson also was called to testify as a defense witness. It was not erroneous for the court to allow the State to treat Hopson as a hostile witness.

■ Defendant's contention that Hopson should not have testified against defendant because it was the State's theory that Hopson and defendant acted together is without merit. At the time defendant was tried, imposition of charges against Hopson had not commenced. It is within the sole discretion of the prosecutor to determine against whom, when and how the criminal laws are to be enforced. *State v. Rogers*, 674 S.W.2d 608, 611[6, 7] (Mo.App.1984). This point is denied.

■ Defendant alleges the trial court erred in failing to declare a mistrial following the testimony of the victim when she broke down on the witness stand because it prejudiced defendant.

■ The drastic remedy of mistrial is to be used sparingly. *State v. Johnson*, 672 S.W.2d 160, 163[6–8] (Mo.App.1984). The trial court is invested with broad discretion in minimizing or eliminating the prejudicial impact of an hysterical witness. *Id.* There is no evidence the outburst was the fault of the prosecutor. If a mistrial had been declared, there is no assurance a similar outburst would not happen on retrial. There was no abuse of discretion in refusing to grant a mistrial. *Id.* This point is denied.

■ Finally, defendant contends it was error to allow evidence of Hopson's offer to pay victim $2,000 to $3,000 in exchange for her dropping the charges against defendant.

Defendant has not preserved this point for appeal. He failed to object to similar testimony previously given by Hopson, and this point was not raised in his motion for new trial. *See State v. Pettit*, 719 S.W.2d 474, 477[7, 8] (Mo.App.1986). In any event, we review for plain error; error that results in "manifest injustice" to defendant. *Id.;* Rule 29.12(b).

■ The State's theory was that Hopson and defendant acted together. Testimony that Hopson offered victim money to drop the charges against defendant is relevant to show the two acted in concert. Further, it shows Hopson's consciousness of guilt in support of the State's theory. *See State v. Hogan*, 748 S.W.2d 766, 770–771[11] (Mo.App.1988).

Furthermore, Hopson testified at trial and was subject to cross-examination. Hopson's version of his conversation with the victim was consistent with victim's version. We find no manifest injustice to defendant. This point is denied.

Judgment affirmed.

GARY M. GAERTNER, P.J., and SIMON, J., concur.